## FROST *v.* PEACOCK and others.

Deed of the 5th of October 1831, executed by husband and wife in conside-
ration of the grantee, who was the wife's mother, releasing dower in the
daughter's land. It had been acknowledged and left in possession of the
daughter for the mother. After the death of the daughter's husband, the
deed was found mutilated by having had the signatures of the grantors
and subscribing witnesses cut out. After this (on the 17th of January
1845) it was recorded: *The court held,* that it was to be taken as an exe-
cuted and delivered deed; but that as the grantors continued in possession
exercising all acts of ownership, the grantee was affected by subsequent
instruments and that an after mortgage by this husband and wife, recor-
ded before the mutilated deed got upon the record, had a preference.

Where a wife joins with a husband in a mortgage of his lands and he dies
after sale in foreclosure and after confirmation of the report of such sale,
she will not be entitled to any amount by way of dower out of any balance
of the avails of the sale.

Where a person buys a portion of lands mortgaged and there is a surplus
on foreclosure, he will not be allowed thereout the amount he purchased at,
but only to as much as his portion contributed to the sale.

*May* 1,
1846.

*Deed.
Mutilated
deed.
Priority.
Mortgage.
Dower.
Surplus.*

ON exceptions to master's report in relation to surplus.

On the third day of April 1821, a bond, with a mortgage
for securing $1,000 and interest on a farm and premises at
Dosoris, Queens County, was executed by Ralph Peacock
and wife to Jarvis Frost.

There was a deed dated the fifth day of October 1831, of
the said premises or of a part thereof between Ralph Pea-
cock and Eliza Ann his wife of the first part and Sarah
Ann Betts of the other part, subject to the said mortgage.
It appeared to have been recorded, but was mutilated prior
to its being recorded, as will be seen by the report of Master
Smith.

There was a deed from Ralph Peacock and Eliza Ann
his wife to Leonard Beedle, dated the tenth day of Decem-
ber 1835, conveying one acre of land, part of the mortgaged
premises. Leonard Beedle died intestate and unmarried,
leaving Jehiel Beedle his father and heir him surviving.
Jehiel Beedle and wife, by deed dated the seventeenth day

of August 1840, conveyed this one acre to the said mortga- <span>1846.</span>
gee Jarvis Frost.

On the first day of May 1840, Ralph Peacock executed <span>FROST<br>v.<br>PEACOCK.</span>
a second mortgage on the premises in favor of William M.
and Willett Weeks.

Premises sold under the mortgage to Jarvis Frost; and
the amount now in controversy was the surplus arising
from such sale.

The mortgagee, Jarvis Frost, claimed as owner of the
equity of redemption of the one acre lot.

Sarah Betts claimed under the mutilated deed.

Eliza Ann Peacock claimed as dower widow of Ralph
Peacock.

William M. and Willett Weeks claimed as second mort-
gagees.

The following is a copy of the master's report and of the
important part of testimony taken before him :

" In Chancery, &c.

Jarvis Frost *v.* Ralph Peacock and others.

To THE CHANCELLOR, &c.—In pursuance of an order
made in the above entitled cause by the vice-chancellor of
the 1st circuit, bearing date the twenty-ninth day of March
in the year one thousand eight hundred and forty-five, by
which it was referred to the subscriber, one of the masters
of said court, to ascertain and report the amount due to
Jarvis Frost; and whether the same be a lien on the sur-
plus moneys arising on the sale of the mortgaged premises
in this cause and, also, as to the liens of any other person
upon the said surplus moneys; and to ascertain the priority
of the several liens thereon : I, *Wessell S. Smith*, the mas-
ter named in said order, do certify and report that, from a
certificate of the clerk of this court served upon me, it ap-
peared that the following claims have been filed to the sur-
plus moneys in this cause, viz. : a claim by Eliza Ann Pea-
cock, by Sarah Betts, by William M. and Willett Weeks
and one by Jarvis Frost, by their several solicitors. And,
also, that I had had a certificate of the names of the defen-
dants who have appeared in this cause laid before me,
whereupon I caused all the said parties who had filed their

claims to said surplus and who had appeared in this cause to be summoned to attend before me upon the matters so referred and that, upon such reference, I have been attended by the several claimants in person and, also, by their respective counsel ; and I have examined the several claimants upon oath touching the justice of their claims and the amounts due to them respectively ; and also examined upon oath the several witnesses produced by the claimants and the documentary evidence exhibited to me.   And, from such evidence and examination, I do certify and report that Jarvis Frost made a claim upon said surplus moneys as being the owner of the equity of redemption of one acre of land being a portion of said mortgaged premises conveyed to him by Jehiel Beedle and wife by deed dated the 17th August 1840.   And which said one acre of land was sold by the master and conveyed to the purchaser under the decree in this cause ; and that there is now due to the said Jarvis Frost the sum of one hundred and eighty dollars, being the amount of the consideration or purchase money paid by him on the sale and conveyance of the said one acre of land to him as aforesaid ; and that the said claim is a lien upon such surplus moneys and has priority of all other claims thereon.   And I do further certify and report that Sarah Betts claimed to be entitled to the whole of said surplus moneys, as being the owner of the equity of redemption of the whole of the said mortgaged premises under and by virtue of a deed bearing date the 3d day of October 1831, made by Ralph Peacock and Eliza Ann his wife to said Sarah Betts, but which said deed had been mutilated by having the subscription of the names of the grantors and of the subscribing witnesses cut out at the end. And from the evidence produced before me, I am of opinion that the said deed never was delivered by the grantors to said Sarah Betts; and that no estate passed under it, but that the same was cancelled and destroyed by being mutilated and is void.   And I do, accordingly, report that the said Sarah Betts has no claim upon said surplus moneys and is not entitled to any part thereof.   And I do further certify and report that Ann Eliza Peacock claimed to be entitled to a right of dower in said surplus moneys as the wife of

Ralph Peacock the mortgagor ; but, from the evidence produced, it appears that the said Ralph Peacock was living at the time of the sale of the said premises and at the time the report of sale in this cause was confirmed. I do, therefore, report that the said Eliza Peacock is not entitled to a right of dower (except an inchoate right) in said surplus moneys and that she has no claim thereon. And I do further certify and report that the said William M. and Willett Weeks claimed to be entitled to said surplus moneys under and by virtue of a certain bond and a mortgage bearing date the first day of May 1840, made and executed by the said Ralph Peacock to secure to them the sum of five hundred and fifty dollars with interest. And I do report that the same is a lien upon the surplus moneys in this cause ; and I have computed and ascertained the amount due to the said William M. and Willett Weeks upon the said bond and mortgage ; and that the amount so due, up to and including the date of this report, is the sum of seven hundred and fifty-nine dollars and forty-nine cents ; and that the said William M. and Willett Weeks are entitled to be paid out of said surplus moneys, after payment of the amount due to Jarvis Frost as above mentioned or so much thereof as the balance of said surplus moneys will amount to. And I do further certify and report that Sarah Betts, Junior, appeared on said reference by her counsel and gave verbal notice of a claim to the whole of said surplus moneys ; but no evidence having been produced in relation to such claim, I report that she has no claim thereon and is not entitled to any part thereof. And I do further certify and report that schedule A, hereto annexed, contains a statement of the amount due Jarvis Frost ; and, also, the amount due to the said William M. and Willett Weeks for principal and interest moneys, the period of the computation of interest and its rate and to which for greater certainty I refer. And I do further certify and report that schedule B, hereto annexed and making part of this my report, contains an abstract of the documentary evidence produced before me ; and to which, for greater certainty, I refer. I have also annexed the testimony, produced before me, to this report to be filed therewith and to which I refer. And I do further certify

1846.

FROST
v.
PEACOCK.

and report that the surplus moneys paid into this court amount to the sum of eight hundred and twenty-five dollars and forty-one cents ; and that no claims to said surplus moneys other than those herein above mentioned have been left with me either previous or since the report of sale in this cause was filed.   All which is respectfully submitted. Dated October 9, 1845.

WESSELL S. SMITH,
*Master in Chancery.*

(TITLE.)

· " Schedule A. referred in the foregoing report :

| | | |
|---|---|---|
| Amount paid by Jarvis Frost, as the consideration or purchase money on the conveyance of the one acre of land to him by Jehiel Beedle, being part of the mortgaged premises and sold and conveyed under the decree in this cause | $180 | 00 |
| Bond made by Ralph Peacock to William M. and Willett Weeks, dated the first May 1840, in the penal sum of $1100, conditioned to pay $550 on the 1st May 1842, with interest thereon secured by mortgage of same date, principal | $550 | 00 |
| Interest thereon from 1st May, 1840, to 9th October, 1845,—5 years, 5 months and 9 days at 7 per cent. . . . . . . . . | $209 | 49 |
| Amount due October 9, 1845, . . . | $759 | 49 |

Dated October 9th, 1845.

WESSELL S. SMITH,
*Master in Chancery."*

(TITLE.)

" Schedule B. referred to in the foregoing report :

1. A deed from Ralph Peacock and Eliza Ann his wife to Leonard Beedle, dated 10th December, 1835, consideration $300, conveying one acre of land, part of the mortgaged premises, with covenant of warranty duly acknowledged and recorded in the Queen's County Clerk's Office in Liber N. N. of deeds, page 396, the 11th June 1836, marked and referred to as exhibit A.

2. A deed from Jehiel Beedle and Mary his wife to Jarvis

Frost, dated 17th August 1840, consideration $180, conveying the same premises, with covenant of warranty, duly acknowledged on the 28th August before Wm. Calkins, commissioner of deeds for Essex County, but not recorded—marked and referred to as exhibit B. Both these deeds were produced on the part of Jarvis Frost.

3. A bond, produced on the part of William M. and Willett Weeks, dated 1st May, 1840, made by Ralph Peacock to William M. and Willett Weeks in the penal sum of $1100, conditioned to pay $550 on the 1st May 1842, with interest thereon marked and referred to as exhibit C.

4. A mortgage by the same to the same, of the same date, given to secure above bond upon that part of the mortgaged premises that was sold under the decree in this suit, excepting the lot that was sold by said Peacock to Leonard Beedle—duly acknowledged and recorded in the Queen's County Clerk's Office in Liber L. L. of mortgages, page 116, on the 22d day of May 1840, marked and referred to as exhibit D.

5. A deed produced on the part of Sarah Betts, dated the fifth October 1831, made by Ralph Peacock and Eliza Ann his wife to Sarah Betts, consideration $1000, conveying the premises or a portion of them subject to the mortgage to Frost, this paper is mutilated by having the signatures of the grantors and of the subscribing witnesses cut out—this deed was acknowledged on the 5th October 1831. Recorded (in its mutilated state) in the Queen's County Clerk's Office in Liber 64 of deeds, page 281, the 17th January 1845, marked and referred to as exhibit E.

6. A bond produced on the part of Jarvis Frost, dated 3d April 1821, made by Ralph Peacock to Jarvis Frost, in the penal sum of $2000, conditioned to pay $1000, with interest at 6 per cent., on or before the 1st May 1822. There are various receipts endorsed of payments of portions of the principal and interest down to 1st May 1837, marked and referred to as exhibit F.

7. A mortgage given by Peacock and wife to the same, to secure the above bond and of the same date, upon a farm and premises at Dosoris in Queen's County, duly acknowledged and recorded in the Queen's County Clerk's Office

FROST
v.
PEACOCK.

Liber 2 of mortgages, page 22, &c. the 27th June 1821. The suit was instituted for the foreclosure of this mortgage. Marked and referred to as exhibit G.

8. A deed produced on the part of Jarvis Frost, dated 6th April 1837, made by Peacock and wife to Burrill Betts conveying, for the consideration of $1000, with full covenants and free from incumbrance, a house and lot of ground, also two lots, part of the mortgaged premises, but excepted out of the sale. Duly acknowledged and recorded in the Queen's County Clerk's Office in Liber R. R. of deeds, page 301, the 2d May 1837, marked and referred to as exhibit H.

9. A release produced on the part of Jarvis Frost, dated 11th December 1835, made by Jarvis Frost to Sarah Betts, administratrix of Burwell Betts, deceased, consideration $552 19 ; releasing a portion of the mortgaged premises. Duly acknowledged and recorded in the Queen's County Clerk's Office in Liber L. L. of deeds, page 434, the 21st January 1836, marked and referred to as exhibit I.

10. The pleadings, viz. : the bill, the answers of Burwell Betts and Peacock and wife and the decree.

Dated October 9th, 1845.

WESSELL S. SMITH,
*Master in Chancery.*

(TITLE.)

"Proofs taken before Wessell S. Smith, master, &c.

Mr. Hammond, on behalf of the complainant, produced a deed from Ralph Peacock and wife to Leonard Beedle, dated 10th December 1835. Acknowledged for a piece of land near the point of Ralph Peacock's land, containing about one acre $300. Recorded in Queen's County, in Liber N. N. of deeds, 396, 11th June 1836. A deed from Jehiel Beedle and wife to Jarvis Frost, dated the 17th August 1840. Consideration $180, for the same piece of land. Acknowledged August 28th, 1840. The complainant also proposes to be examined, touching his claim upon the surplus in this cause. Mr. Western objects, &c. *Jarvis Frost,* being duly affirmed, saith : Q. Who is the grantee in that deed made and executed by Jehiel Beedle and wife to Jarvis Frost, filed with the master and now shown to you? A. I am. Q. How much money did you pay as the consideration of

that deed? A. One hundred and eighty dollars. Q. To whom did you pay that money? A. To the order of Jehiel Beedle. Q. When did that take place? A. I am unable to say otherwise than by the date of the deed. The deed is dated 17th August 1840. It was paid a fortnight or three weeks previous to the date of this deed. Q. Did the interest which you thereby acquired continue in you until the foreclosure? A. It did. I have never parted with it. Q. Have you received any portion of the consideration money back? A. I have not. Q. Are the premises mentioned in the deed to you a part of the premises, described in the mortgage from Peacock and wife to you, forclosed in this suit? A. They are.

Sworn, &c.              JARVIS FROST.

*Benjamin Cocks*, a witness produced on the part of Jarvis Frost, being duly affirmed, saith. Q. Where do you reside? A. In Glen Cove, town of Oysterbay. Q. What is your age and business? A. I am sixty-four years of age; and, a tailor by trade. Q. Were you acquainted with Jehiel Beedle in the year 1840 and before and after? A. Yes. Q. Where did he belong in 1840? A. In Shoreham, Addison County, State of Vermont. Q. Do you know whether he was the grantor named in the deed to Jarvis Frost now shown to you? (Exhibit B.) A. He was to the best of my knowledge. Q. Do you know the premises in that deed and can you say whether they form a part of the premises mortgaged by Ralph Peacock to Jarvis Frost? A. I know the premises, they are a part of the mortgaged premises. The mortgage was on it at the time of the purchase and covered it. Q. Did you know Leonard Beedle named in deed now shown to you and also the grantors in that deed? (Exhibit A.) A. I know them all. Q. Do you know the premises in that deed and are they the same mentioned in the deed from Jehiel Beedle to Frost? A. I know them, they are the same premises. Q. Do you know whether, at the time Peacock made that deed to Leonard Beedle, the land was subject to the mortgage to Frost? A. It was, and known to all the parties to be so at the time the money was paid. Q. Do you know whether the con-

1846.

FROST
v.
PEACOCK.

sideration money in that deed was paid? A. It was paid.
Q. What relation was Leonard Beedle to Jehiel Beedle?
A. He was his son. Q. Was Leonard married? A. No.
Q. Had he any children? A. No. Q. Did he leave a
will? A. No. Q. Is he now living and if not when did
he die? A. He died five or six years ago last March. Q.
Who administered upon his estate? A. Udney H. Everest.
Q. Is he the person whose name appears as a witness to the
deed from Beedle to Frost? A. He is the same person.
Q. Did Jehiel Beedle take possession of the premises after
the death of his son Leonard; and if so, how? A. He did
as his heir at law. Q. Is he the same Jehiel Beedle who
conveyed to Jarvis Frost? A. He is. Q. How are the pre-
mises situated as regards the other portions of the mortgag-
ed premises—as regards value? A. It was considered to
be the most valuable, being situated on the point near the
dock. It was considered so at the time and would be so
now. It is a building spot—there was a cellar dug and
stoned up by Leonard Beedle while he owned it and remains
there.

   Affirmed, &c.       BENJAMIN COCKS.

 As to claim of William and Willett Weeks: 1. A bond
made by Ralph Peacock to William M. and Willett Weeks,
dated the 1st May 1840, in the penalty of $1100, conditioned
to pay $550 on the 1st May 1842, with interest thereon.
Marked exhibit C. 2. A mortgage of even date with the
above bond made by Ralph Peacock to the same persons to
secure the payment of the above bond on premises at Pea-
cock's Point. Recorded in the Queens county clerk's office
in Liber L. L. of mortgages, page 116. May 22, 1840,
marked exhibit D.

 *William M. Weeks*, being duly sworn, saith, that he re-
sides at Glen Cove, town of Oysterbay and is one of the
persons named in the above mentioned bond and mortgage;
that the premises mentioned in said mortgage are a part of
the lands described in the mortgage from Peacock to Frost
foreclosed in this suit and are the same premises sold under
the decree in this suit; that there have been no payments
made to this deponent or to Willett Weeks on account of the

same, but that there is now due to this deponent and the said Willett Weeks the whole principal sum of five hundred and fifty dollars with interest thereon from the date of the said bond according to the condition thereof; and that the same is so due over and above all the claims of the said Ralph Peacock or any other person against the same either by way of payment, offset or otherwise; and that he hath no other security or satisfaction therefor other than said bond and mortgage.

1846.

FROST
v.
PEACOCK.

Sworn, &c. WM. M. WEEKS.

The claim of Jarvis Frost was resumed and Benjamin Cocks being recalled and examined, saith. Q. Was the lot mentioned in the deed from Beedle to Frost sold with the rest of the mortgaged premises at the sale under the decree in this cause? A. It was.

Sworn, &c. BENJAMIN COCKS.

As to the claim of Sarah Betts.

*John L. Riker*, produced as a witness on the part of Sarah Betts, being duly sworn and examined, saith, I am a counsellor at law doing business in the city of New York and was so on the thirtieth day of September 1831 and have been ever since; and that, from a memorandum book now in my possession and the deed now shown to me here, I find that on the thirtieth day of September 1831, I drew a deed for one Ralph Peacock from him and wife to one Sally Betts bearing date the fifth day of October 1831, now shown to me and marked exhibit E. That the said deed was prepared by me and is in my handwriting; that I am unacquainted with the parties named in the said deed, but I presume I drew the same at the request of Ralph Peacock, because I find that, on the said thirtieth September, by the entry to which I have before alluded, that Mr. Ralph Peacock paid me five dollars for drawing the said deed, that the deed was not then executed, but the day of the month was left blank to be filled up when the same should be executed. And that is all I know about the matter. Q. Was this an honest and *bona fide* transaction and done in the regular course of business in your office? A. The deed was honestly prepared in the usual manner, but, as to the transaction

between the parties, I know nothing about it, nor have I any recollection thereof.

Upon cross-examination by Mr. Hammond.—Q. For aught you know, then, the said deed may have been perfectly voluntary? A. My instructions must have been to put in one thousand dollars as the consideration, but whether that was the true consideration I don't know. Q. Have you any knowledge beyond those instructions? A. I have not and that only looking at the deed the consideration is in my handwriting.

Sworn, &c.                          J. L. RIKER.

*Sarah Betts*, being duly sworn, saith, that she is the grantee mentioned in exhibit E now shown to her. Q. Why was this deed executed to you by Mr. Peacock and wife? A. It was for property that I owned in Troy—a dower right which I held in that property. Q. Who sold that Troy property and what did you do when he sold it? A. Ralph Peacock and his wife sold the property—I signed off my dower right to Peacock and he gave me this deed for it. Q. Who did this Troy property come from? A. My first husband, Nathaniel W. Betts, who died and left it. Q. Who did he leave as his heirs? A. Myself, his widow, and Mrs. Peacock his only child. Q. Did you and Mrs. Peacock fix on any sum your dower was worth? A. I think it was $1000 he was to give me. Q. Has that one thousand dollars ever been paid to you, except by this deed? A. It never has. Q. Have you ever given up your right under this deed? A. No. Q. Have you any other security or payment for that dower right except this deed? A. None. Q. Have you ever consented that this deed should be cut and cancelled as it now is? A. No. Q. Are the premises mentioned in the deed a part of the property mortgaged to Mrs. Frost? A. I have no doubt it is. I understood it so.

Sworn, &c.                          SARAH BETTS.

*Eliza Ann Peacock* being called as a witness on the part of Sarah Betts, objected to. The master overrules objections and the counsel excepts. The witness being then sworn and examined, saith. Q. What was the consideration of the deed from you and your husband to Sarah Betts

1846.

FROST
v.
PEACOCK.

now shown to you and marked E? A. It was given for her right of dower in property at Troy belonging to me and which myself and husband sold. Q. Was any amount agreed upon as the price which your husband should pay your mother for her right of, dower? A. One thousand dollars. Q. Who got the money for which the Troy property was sold including the value of the right of dower? A. My husband, Ralph Peacock. Q. Do you know whether or not that one thousand dollars has ever been paid to your mother except by that deed? A. It has not been paid no more than by that. Q. Where and how near did you and your mother live to each other at the time that deed was acknowledged? A. We lived at Peacock's Point a short distance apart, on this property—about one hundred feet apart. Q. What was the age of your mother at that time and was she married or a widow? A. She is now about sixty-nine years of age. She had a husband then living—he was her second husband, Burwell Betts. Q. Is he now living; if not, when did he die. A. He died about ten years ago. Q. Was that deed now produced (exhibit E.) ever signed and sealed by any body, and if so by whom? A. It was by me and my husband. Q. Was it witnessed by any body, and if so, by whom? A. It was witnessed by Martin Davis now present. Q. Was your mother present at that time? A. Yes sir.

*On cross examination.*—Q. What did the property in Troy sell for? A. I think it was four thousand dollars.

*Direct examination resumed.*—Q. Who had the custody of this deed for safe keeping? A. I had myself. Q. Who did you get it from? A. I don't know as I can say exactly who gave it to me. I can't recollect about that. I expect that my mother gave it to me, but I can't recollect. Q. Who was you keeping it for? A. Mother. Q. Did any thing happen to that deed while you was keeping it, and if so what? A. Yes sir, it was mutilated. Q. Who by? A. I can't say. Q. Was it by the consent either of your mother or yourself? A. It was not. I discovered it myself and me and my mother found a great deal of fault about it when we discovered it. It was in my drawer when I first discovered it.

Vol. IV.—87

*Cross examined.*—Q. How long after the execution did you discover the deed to be mutilated? A. I can't tell the exact time. Q. Was it before or after the mortgage to Weeks? A. It was before the mortgage to Weeks I think. Q. Does your recollection enable you to say whether you discovered the mutilation within a year after the deed was executed? A. I can't say about the time. It was more than one year. It might have been more than two or three. I can't recollect exactly about it. Q. Can you say it was more than four years? A. I don't know that I can.

Sworn, &c.                    ELIZA ANN PEACOCK.

As to the claim of Eliza Ann Peacock.

*Eliza Ann Peacock* being duly sworn, saith, that I am the wife of Ralph Peacock. I was married the 15th January, 1815. Q. Have you ever released your right to this property excepting by the deeds to your mother, to Leonard Beedle and the mortgage to Frost? A. No sir. Q. (By the master.) Have you received any security, payment or satisfaction for your right of dower other than the consideration stated in the several deeds executed by you above spoken of? A. I have not.

Sworn, &c.                    ELIZA ANN PEACOCK.

*Martin Davis*, another witness called on the part of Sarah Betts, saith. Q. Look at the paper marked exhibit E. now shown to you and say if you ever saw it before? A. I have seen it before. Q. Did that paper ever bear your signature, and if so for what purpose did you sign it? A. I signed that paper as witness. Q. Did any other person beside yourself sign it as a witness at the same time, and if so whom? A. Yes, sir, Burwell Betts. Q. Is he dead or alive at this time? A. He is dead. Q. Before you signed your name as a witness, did any persons, and if so whom, execute that paper? A. Yes sir, Judge James Hegeman. Q. Did any body else sign it; and if so, whom? A. Ralph Peacock and wife. When I answered Judge James Hegeman above, I understood you to mean witnesses. Q. Name all the persons that you can now recollect who were present at the time of the execution of this paper? A. Judge Hege-

man, Burwell Betts, Sarah Betts, Ralph Peacock, his wife and myself, that is all I can recollect.

*Cross examined.*—Q. When was this paper signed by you? A. I can't say exactly—some ten or fifteen years ago. Q. Who called on you to witness this paper? A. Ralph Peacock. Q. Where were you when Ralph Peacock called on you? A. In the field at work. Q. In whose employ were you at that time and in what capacity? A. In Peacock's employ digging potatoes; I was hired by the year to work on the farm. Q. Look at the paper marked A now shown to you; did you ever see that before, and if so where? A. I never saw that paper before that I know of. Q. Look at the paper marked B now shown to you; did you ever see that before, and if so where? A. Not that I know of. Q. Look at paper marked D now shown to you; did you ever see that before? A. No. Q. Whose signature is that to the paper marked D? A. I can't say whose it was. Q. Have you ever seen Ralph Peacock write? A. Yes. Q. How often? A. I can't say how often—more than once, twice, three times, half a dozen times. Q. Are you acquainted with his handwriting? A. I have not seen his handwriting lately. Q. Were you acquainted with his handwriting ten or fifteen years ago? A. I have had some of his writings—I was acquainted with it. Q. And still you do not know in whose hand writing the words Ralph Peacock signed to paper D now shown to you are? A. I do not. Q. Do you know in whose handwriting the paper marked E now shown to you is—the written part of the deed? A. No sir, I don't. Q. How then do you know that that is the same paper you testified you have had your signature affixed to? A. I think I have seen the same paper; I know it by that hole in it. Q. Are there any particular marks in or about this paper excepting that hole by which you can identify this to be the same paper you then signed, and if so state them? A. I don't know that there is any particular marks. Q. Do you know of your own knowledge when, how and by whom this hole that you speak of in this paper was made? A. No sir, I don't. Q. When you speak of recognizing this paper as the same paper you once signed as a witness and knowing it by the hole in the paper, what

1846.

FROST
*v.*
PEACOCK.

length of time has it been since you first saw that hole in the paper? A. I can't say as to the time. Q. After this paper was signed by the several parties, how long was it before you next saw it? A. I can't say exactly, it might have been some two or three or four years. Q. Was the paper in the situation it is now as to being cut? A. There was a hole cut in the paper. I expect it was the same as it is now. Q. Where did you see it at the time you just spoke of? A. I saw Sarah Betts have it. Q. Did you ever see this paper again until after Jarvis Frost had commenced a foreclosure of his mortgage; and if so, state when and where? A. I saw it here the other day. I don't recollect I saw it before, except as I spoke of—it was either on Friday or Saturday last. Q. Who showed it to you then? A. It was either Mrs. Betts or Mrs. Peacock, I think. Q. Is that the time that you alluded to when you formerly said you saw this same paper in its mutilated state in the possession of Mrs. Betts? A. I saw her have it at home some three or four years ago with the hole in it. Q. Where do you now reside and in what capacity? A. I live with Mr. Peacock and work on the farm.

Cross examined.—Q. How old are you? A. Forty-nine. Q. What is your business? A. Sometimes working on a farm—sometimes on vessels—sometimes one thing and sometimes another. Q. What proportion of the last fifteen years have you been in the employ of Mr. Peacock or his wife? A. The bigger part of the time. Q. At the time you witnessed the instrument which you say you witnessed at the request of Mr. Peacock and at the execution of which you say Mrs. Peacock and Judge Hegeman were also present and that you and Burwell Betts became the witnesses, had that instrument which you then so witnessed the hole in it of which you have spoken at that time? A. No sir.

Sworn, &c.                                MARTIN DAVIS.

Eliza Ann Peacock recalled on the part of Sarah Betts and examined by Mr. Western, saith. Q. Had Jarvis Frost any knowledge of the existence of this deed from yourself and husband to Sarah Betts (being exhibit E) and if so when? A. He was at my house where I now live about

1846.

FROST
*v.*
PEACOCK.

three years ago this month. I can't be positive as to the exact time, but I think it was about that time—he was in the east part of the house in the room where we eat, with myself and two daughters; there was mention made of this deed, we was talking about it being given and so on—he then spoke and said he knew of it—that my step-father told him of it before his death.

*Cross-examined.*—Q. When did your step-father die? A. 22d April, 1835. Q. Are you sure Mr. Frost said what you represent him to have said? A. I am sure. Q. How long did you forget it? A. I never forgot it at all. Q. Who mutilated that deed? A. I don't know; I did not see any one do it. Q. Have you any doubt who did it? A. I can think who did it, but as to say positively, that I could not do. Q. Who do you think did it? A. I think my husband done it. Q. I understand from the testimony you gave when you was up before that that deed laid in a drawer, to which you and your husband had equal access? A. Yes; I suppose we had equal access to it. Q. While it so lay there you discovered it to be mutilated? A. Yes; when I took it out I discovered it to be mutilated; that it had been cut by some one.

*Direct examination* resumed. Q. What did your husband say or do which made you think he did it? A. I can't say as any thing particular at the time; I expect it was done some time before I discovered it. We found fault with its being done; my mother and myself, I mean. Q. Did he ever boast of having done it and say now I have fixed the old woman or any thing like that? A. Not that I heard. Q. Did he say nothing to you nor you to him about it? A. He and I once had a conversation walking along in Brooklyn about four or five years ago; I talked to him and upbraided him about it, and asked him why he should do it, and he said he thought he would fix it; as near as I can recollect, that is the reply he made.

*Cross-examined.*—Q. If I have rightly understood your testimony, that deed, for aught you know, might have been mutilated before it was put into that drawer? A. No sir; I don't think it was mutilated when it was put in there; I

think I put it in there myself; when I put it there it was not mutilated; and when I took it out it was.

*Benjamin Cocks,* a witness produced on the part of the complainant, being duly affirmed and examined, saith: Q. Were you acquainted with Leonard Beedle and Jehiel Beedle? A. Yes. Q. Were you executor to either, and which? A. I was executor to Jehiel Beedle. Q. When did Jehiel Beedle die? A. Four years ago next September. Q. Have you any recollection of the circumstances attending the sale of the piece of land described as being about one acre, by Peacock and wife to Leonard Beedle, part of the mortgaged premises in this case? A. Yes. Q. Will you relate these circumstances? A. Leonard Beedle purchased this lot of land of Peacock, and four shares in the dock at the same time, for the price of three hundred dollars for the land and one hundred dollars for the shares in the dock. He did not pay it to my knowledge; he gave his note for the amount, payable the first of May following; this note remained one year before paid, at seven per cent, and was then paid by his father Jehiel Beedle. Q. At what time did Leonard Beedle die? A. In the month of March, six or seven years ago. Q. In the administration of Jehiel Beedle's estate, did you ever discover the deed now set up by Sarah Betts? A. No; I never heard of it till last winter. Q. Were you conversant with the affairs of Leonard and Jehiel Beedle so far as their transactions in relation to this land went? A. Yes. Q. From the circumstance in which you stood and the business which you transacted, if there had been any real *bona fide* adverse claim against the title to this one acre of land, would it in your opinion have come to your knowledge? A. I should say it would, from what I had to do with it. I signed the note with Leonard as security; and there was no incumbrance to my knowledge except the mortgage to Frost.

*Sarah Peacock,* a witness produced on the part of Sarah Betts, in opposition to the claim of the complainant. Q. Do you know Jarvis Frost? A. Yes. Q. Have you any recollection of a conversation at the house of your mother in relation to a deed of your grand mother's? A. Yes, sir. Q. Who was present at that conversation? A. My mother

(Eliza Ann Peacock,) Mr. Frost and myself; I think my sister was there, but am not certain. Q. What took place? A. They were talking about a deed; I think my mother asked him if he knew there was such a deed and he said yes. Q. Did Mr. Frost say who had told him of it? A. Yes, sir; my grandfather. Q. What was his name? A. Burwell Betts. Q. What is the name of your sister whom you think was present? A. Mary Augusta. Q. When was this? A. I don't know when it was; I believe it was three years ago this spring; three or two, I am not positive which.

*Sarah Peacock,* a witness again produced on the part of Sarah Betts. Q. Do you or not know of the decease of Ralph Peacock, one of the defendants in this suit? A. I do know of his decease. Q. At what time did he die? A. I don't know, but I believe it was in August, 1845. Q. Were you present at his funeral; did you see him interred; if so, where was it? A. I was; it was at Peacock's Point, in a burying-ground there.

Mr. *Western,* for the defendant Mrs. Peacock.

Mr. *J. Hammond,* for Jarvis Frost.

THE VICE-CHANCELLOR:—The deed—afterwards mutilated—from Peacock and wife to Sally Betts, dated October the fifth, one thousand eight hundred and thirty-one and acknowledged on that day before Judge Hegeman, is to be regarded as an executed and delivered deed: *Schrugham* v. *Wood,* 15 Wend. R. 545. It is to be allowed the same effect as between the grantors and grantee as if it had always been in the actual possession and keeping of the grantee. It is in vain, therefore, for Mrs. Peacock, although she be now a widow, to claim any rights of dower in the property, for she united with her husband in thus conveying. But, if that deed had not been made, it would be doubtful whether she could claim dower in the surplus arising from the sale in foreclosure, inasmuch as her husband was living when the decree was made and when the sale took place and for a considerable time afterwards: *Titus* v. *Nelson,*

1846.

FROST
*v.*
PEACOCK.

Sept. 30.

5 J. C. R. 452; and see *Hawley* v. *Bradford*, 9 Paige's C. R. 200. I think, with the master, that her dower is cut off entirely.

Then, how stands the case as between Mrs. Sally Betts, the grantor under that deed and the other parties who claim the surplus? By not recording the deed and by leaving Peacock in possession of the land, exercising all acts of ownership as if he were still the real owner, she has lost all right to interfere with those who have taken any subsequent deed or mortgage from Peacock in good faith and for valuable consideration, trusting to his original title and apparent ownership: 1 R. S. 756, § 1, 37. William Weeks and Willett Weeks, with their mortgage of the first day of May one thousand eight hundred and forty and duly recorded long before the deed to Mrs. Betts was recorded, stand in the light of *bona fide* purchasers for valuable consideration and are entitled to priority and preference over Mrs. Betts with respect to this surplus. That their mortgage was taken for a precedent debt and not for money advanced at the time makes no difference in respect to its being a valuable consideration. In addition, they parted with a right of action for two years, having allowed two years on the bond and mortgage for paying the debt.

The remaining question is between the Messrs. Weeks and Jarvis Frost, who claims one hundred and eighty dollars out of the surplus to reimburse him that amount of money paid for one acre of the premises sold under his decree, of which he had previously acquired the absolute estate by purchase. He was under no necessity to allow that acre of land to be sold. He might have had it exempt from the sale. The most that he can claim to be returned to him out of the proceeds is as much as it may be fairly supposed the acre sold for in proportion to the other land. In justice and equity he can claim no more; and what this acre has contributed to the sale cannot, I consider, be put down at more than eighty dollars. This sum Mr. Frost may be allowed; and the master's report is considered as modified accordingly.

The exceptions taken by the defendants to the master's report are overruled, except as to the allowance of one hun-

dred and eighty dollars reported to Mr. Frost, which must be reduced to eighty dollars. In all other respects the report is to stand confirmed. The master's costs on the reference are to be paid out of the surplus. The eighty dollars to Mr. Frost and the residue to William and Willett Weeks on account of their mortgage debt and all parties must be left to bear their own costs on the reference and of this hearing.